All right. This is Judge Schroeder present in the courtroom with Judge Tashima. We understand that counsel are present and that Judge Bybee is with us by phone. Is that correct? I am here. Good. So we'll proceed to hear this case, which is United States... We have one more on the phone, too. Do we have... Oh, yes, we have... Who is on the phone? Yes, this is David Duke. David Duke. Captain Tommy Mann, yes. Right. And Mr. Hammond is... Or Ms. Hammond is here in the courtroom. Thank you, Your Honor. Very good. Okay. You may proceed. Thank you, Your Honor. And, Your Honor, just for the Court's information, I did speak with Mr. Duke last week. I will be discussing the issues related to the search warrant, and Mr. Duke will take up the issues related to the 924 seat count in this appeal. Okay. The Supreme Court recently reaffirmed its holding, as articulated in United States v. Chadwick, that a warrant which describes the persons or places to be searched and items to be seized with particularity assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his authority. Your Honors, that is exactly the issue that this appeal addresses today. It goes to the very heart of Fourth Amendment jurisprudence. What we have here is a case whose entire investigation and prosecution stems off of the search warrant, which was executed in Sweetgrass County on National Forest Service land. The search warrant at issue described a far-reaching wilderness area, approximately 160 acres of wilderness area in the Crazy Mountains in Montana. This area encompassed approximately five fire pits, meaning different campsite areas, and a number of other campsite stop grounds. The particularity requirement here is simply not met. The government attempts to salvage this search warrant by stating that there was a description of an orange truck driven and owned by my client, Mr. James Pollender. However, at the time of the execution of the search warrant, the truck was not at the campsite. The tents at this campsite were not described. The colors of the tents were not described. The numbers of the tents were not described. And, in fact, this search warrant describes property and premises located at a campground up Cherry Creek Road on the west fork of the Lower Deer Creek. The executing officers searched a campsite at the Upper Deer Creek. While the district court cited this as a minor technical error, the reality of it is there is an Upper Deer Creek and a Lower Deer Creek area, both of which are distinguishable campsite areas in that same 160-acre wilderness expansive divide. So there are a number of issues related simply with the particularity requirement. The other issue that is raised in our appeal that's related to this search and to the validity of this search is the actual execution of this search warrant, which in our position stands in violation of the former Rule 41D of the Federal Rules of Criminal Procedure as articulated by this Court's decision in United States v. Gantt. What happened in this case is just as the officers were about to begin their search, they looked up this road. And for the Court's information, it is a dirt road that travels up this mountain. They look up this dirt road, and they see the identified vehicle, the only thing that is specifically and particularly described in the search warrant, coming down the vehicle, coming down the hill. At that point, before the vehicle ever arrives at the campsite area, the nine officers approach this vehicle, stop the vehicle, arrest my client, Mr. Pollender, arrest Mr. Duke's client, Ms. Mann, put them in handcuffs, have them undress, and have hazmat suits on. Before they arrive, I mean, how far away are you talking about? Your Honor, from my memory, it is approximately, it's within 100 feet. So they probably could see what was going on. Yes, they probably could, although it's my understanding, too, that it was just beginning. It was dusk at this time, although they should have been able to see from the vantage point, where it's my understanding that the vehicle was stopped. The two defendants were immediately placed in handcuffs, and with all of the police officers at the scene, including a Forest Service agent, Montana Highway Patrol agent, numerous sheriff's deputies from, I believe, three surrounding counties, no one had a search warrant that they provided to these two defendants. No one read a description of the items to be searched, the place to be seized, the reason for the invasion, and the privacy of these two individuals. There was no discussion of it. The only, from the suppression hearing transcript, I know this Court is aware of the fact that there was one officer who did admit that when he transported my client from that wilderness area to the jail in Big Timber, which is the county seat of Sweetgrass County, that my client did say something along the lines, well, I guess you guys probably have a search warrant, because you couldn't do this without a search warrant. My client also testified at that hearing and stated that he had numerous conversations about a search warrant. At the moment of his handcuffing, at the moment he was placed in the car, at the time he was interrogated by Josh Aldman, the National Forest Service agent. So there was discussion that night about search warrants. Search warrant was not provided until approximately 10.30 a.m. the next morning, and that is according to one of the Forest Service agents. According to my client, he never saw a search warrant until September 24th, four days after this search took place. This is exactly the kind of behavior that Rule 41D was written to protect, and it's exactly the kind of police conduct that the exclusionary rule was created to protect. My client's privacy rights were violated, as were his co-defendant's rights. And if I may reserve the three minutes, 50 remaining, unless there are any questions of the panel. Thank you. Thank you. Wait, who's on the phone? Mr. Duke. Mr. Duke. Thank you, Your Honor. This is David Duke, and I'm appearing on behalf of Tommy Mann to argue the gun counts. Count four and count five are the gun counts. They are possession of the firearms and furtherance of a drug trafficking offense. The attorney for the government has filed a Rule 28J supplementing the authority, and the authority is the United States v. Kraus, which I have in front of me, and indeed the Ninth Circuit has recently come down with an opinion on the definition of and furtherance of, and that's what I will also be using this morning. Now, the guns in this case, count four is a Smith & Wesson, and count five is a pin gun, and both of those guns were in a locked safe. Now, this safe is in the truck, and it is in between the driver's seat and the passenger's seat. Counsel, is the safe clearly designed for the use of guns? Is that what the purpose of this safe is for ordinarily? Is it unusual to find a safe in a truck? I personally have not looked at that, and so I cannot answer the size and shape. It would have to be a fairly small one. I do understand it is in between the two bucket seats. Do you know whether the safe was a feature that was attached? Is the safe attached to the truck itself, or is it movable? I'm sorry, I do not know that answer either. Perhaps my co-counsel, when she gets up and reserves some time, has an answer for that. I agree with you. I have not seen a safe come as a standard function of a truck, and I simply doubt that it was issued from the factory. But continuing on, there was a safe there. It was a locked safe. It did have a combination key. Count one is the drug trafficking offense in which this particular crime is connected with. Count one is the manufacturing of methamphetamine. The implements for that manufacturing were in a tent, and as my co-counsel just said, maybe it was 100 feet away, maybe 150 feet away, at the time when Tommy Mann and James Pollender arrived in the truck. Mr. Duke, this is Judge Schroeder. I'm just wondering, the gun was not where the methamphetamine was actually being manufactured. Is that correct? That is correct. But it was with the defendants, was it not? Were there two guns or just one? There were two. Two, yeah. With the defendants, were they not? They were in the same vehicle, yes. But the guns were inside the safe. Well, apart from the safe, they were with the defendants, and one would suppose that if the defendants wished to protect the site, that they wouldn't leave the guns at the site, would they? Well, I don't think they would have the idea of the guns protecting anything as far as illegal activity, and they were just merely there as a coincidence. As a coincidence? Yes, as it is definitely legal to own guns in the United States, and the guns were there in the vehicle. I believe if they had the intent to protect anything,  When you say the guns were in a safe, what is a safe, in the back of the truck? No, it's in the front seat between the two, between the passenger seat and the driver. You mean a little portable safe? That's my understanding, Your Honor. All right. And that's locked, right? Yes. And the key is? As I understand, the key was on the key ring, which was in the ignition of the truck. All right. So the key to the safe was in the truck with them? Yes. It was on the key ring, which had other keys on it also. Counsel, what else was found in the safe? There were two guns. I believe there was, and I had a list of it here. We had some scales. We had some scales. I think some pseudofedrin and also. . . Pseudofedrin is an ingredient in the manufacture of methamphetamine. Is that correct? It can be used for that, yes. Okay. Is there an alternative use that would have been lawful? Is it an over-the-counter drug or a prescription drug? It is over-the-counter, Your Honor. Okay. It does have another legal use as far as an antihistamine. Okay. Was this found in a commercial form? Yes. As far as I know, it was a commercial form. Okay. Was there anything else besides the scales and the pseudofedrin? That's the only thing that I have listed here, Your Honor. This is Judge Schroeder again. If the guns had not been in the safe but had been lying in the truck when they approached and saw the police officers, would that make a difference to your argument? It would make a difference, Your Honor. The fact that the guns were in the safe shows that they were not accessible. So it really turns on whether they were in the safe? Well, even if they were not in the safe, I guess I could make the argument that they were not. But it would be a lot harder argument. It would be harder. And the reason why, as the Crouse case shows, is that many of the cases turn on the accessibility. Right. And I would hate to see this particular case be used to expand the case law to show that guns inside of a safe somehow are connected. I don't think Congress intended that. Because the Crouse case shows that they warn that even if a gun is merely present in a room, you have drugs and a gun in a room, and they're merely present, that's not enough. There has to be some sort of affirmative showing that the gun was in furtherance. And I realize that, in my opinion, the cases are somewhat contradictory. One case says mere presence is not enough, but another case says, well, if they're easily accessible, that shows that, indeed, they can be used in furtherance. In this particular case, being in the safe, it shows that they're not accessible and doesn't meet the statute. What is a pen gun? A pen gun is a gun that's in the shape of a pen. It usually holds one bullet and can only fire one projectile. There is some controversy whether or not the pen was operational or not. Apparently the FBI was able to discharge a bullet which destroyed the pen itself. It's not the kind of weapon that one would use for target practice or something like that, I take. You are correct. Are there any further questions? All right. Thank you. We'll hear from the government. You have about five minutes left. Thank you. May it please the Court. I'm Jeff Sigdolson, counsel for the government. I guess I would like to begin my argument by addressing the defendant's claim that there's a violation of Rule 41 in this case. I think the issue that's presented is whether or not the circumstances found with which the law enforcement officers in this case were presented, which is they had located and found a methamphetamine lab before the defendant's arrival at the scene, and they immediately placed the defendants in arrest and removed them from the scene once they did arrive, whether those are the types of exigent circumstances that excuse the service of the warrant at the scene itself. I think the defendants do not, I think, contest that this was, in fact, a volatile and dangerous situation. By its nature, methamphetamine labs are dangerous both to the officers that are executing the search as well as other individuals who may be in the vicinity. In addition, or excuse me, I should say in part for that reason and because there was clear evidence of criminality found at the search, when the defendants arrived, they were immediately arrested and removed. That arrest, that custodial arrest, the Supreme Court has repeatedly noted, is itself an issue which presents serious risks to the officers, weighty risks that are entitled to the officers taking reasonable steps to protect themselves. That risk is both in the execution of the arrest and also in the level of the duration of the period in which they are holding those individuals as they're transporting them for processing. Because of the significance of the risks that the officers were faced with in this case, it was appropriate for them to not take steps that would divert or delay their arrest, but would require them to do so in a manner that was less safe. And I think the officers here could reasonably have concluded that serving the warrant at the scene would have, in fact, done just that. I guess sort of it's probably helpful to look at this at some level of specificity. The defendant argues in their reply brief, or I should say the defendants argue in their reply brief, that the warrant could simply have been read to the defendant at the scene. I guess I have sort of two points I'd like to make specifically about that, one of which is it's not clear that reading a warrant to the defendant would satisfy this Court's jurisprudence as to what would constitute service of the warrant under Rule 41. This Court has indicated, and Ramirez, Ramirez, and I apologize, I can never remember the non-Supreme Court name of the case. It was in the Supreme Court, Groh v. Ramirez, and this Court was Ramirez v. Silver, Bow, County, and I'm mangling the name. I apologize. In addition, inherent in reading the warrant at the scene would have been a delay. Now, the warrant here was not overruling Long, but that is not at all the case in most circumstances. Federal warrants are often much lengthier, and so a rule that would categorically require law enforcement officers to even read, let alone provide an opportunity for the defendants to hold and review a warrant themselves, I think would put officers at an undue risk of injury and harm. I also, I guess, like to address the other two aspects of the Rule 41 argument, which is what is the appropriate remedy if there was a violation here, and specifically is it something that should lead to suppression of the evidence. And the second is was this, in fact, a search that was even covered by Rule 41. I'll start with the second of those real quickly. There is, this was clearly a State warrant. It was issued, it was sought by State officers. It was issued by a State judge. It was issued to State officers for execution. The execution of the search warrant itself was conducted by two State law enforcement officers, Detective Rodriguez and Detective Crawford. There were Federal Fire Service officers at the scene. However, they were not involved in the actual execution in the sense of conducting the search. The evidence in the record is that the other officers who were present were there for backup and perimeter security, not the actual search of the site itself. I think the issue here is whether or not this clearly State warrant became Federal in character because it was anticipated that there would be a Federal prosecution. And as we know in our brief and as the defendant relies on in their reply brief, there is this testimony that the special agent here, the Forest Service agent, was operating under, I think he said, an understanding that if there was information found, they would prosecute this Federally. This case is in that respect, I would submit to you, indistinguishable from Palmer. Palmer, in Palmer, the Federal prosecutor said that they would pursue the case, would want to pursue the case Federally if sufficient evidence of severe criminality was found, if they found 100 marijuana plants in the grove. I think the testimony here obviously was not developed because this was not an issue on which the Court focused or the parties focused below. But I think the reasonable interpretation of the testimony is, if it even goes this far, is at least the agent was under the assumption if they found a meth lab here, this case would go Federal. But I don't think it was going Federal regardless of what the search found. If the search found that there was merely possession or even possession with intent without the meth lab, I don't think it's a reasonable inference from the testimony that that case was going Federal. In other words, it was the quantity and the quality of the evidence that would be found that would determine whether the case went Federal or State. And that makes it very much like Palmer. In fact, it makes it indistinguishable from Palmer. And the violation of Rule 41 is what, technically? What would be the violation in this case? Yeah, what is the violation? The violation in this case, as I understand it, would be the failure to have served the warrant at the scene, which Gant says, absent exigent circumstances, a warrant must be served under the rule at the scene. Well, when you said earlier that, well, whether it be a Federal prosecution depends on whether the prosecutor thought there was sufficient evidence, which is always true. But in this case, since all this happened on a Federal enclave, can you have a State prosecution? You can, Your Honor. The State has concurrent jurisdiction over offenses occurring on national forest land. Statutorily, it's 16 U.S.C. Section 480. And then the Montana Supreme Court has held, you know, interpreting that statute the same effect in Wagner v. Montana, which is 889 Pacific 2nd, 1189. So the fact that this was forest land does not make it necessarily a Federal make the search Federal in character. The defendant has argued that the evidence here should be suppressed because this was a deliberate violation or the failure to serve the warrant was in deliberate disregard of the rule. This Court's cases is made clear that's actually a quite high standard. It requires subjective bad faith. In United States v. Freitas, the Court made the point that it's not even a question of objective unreasonableness as in Leon. It requires much more than that. It requires subjective bad faith. I would submit to Your Honors, based on the circumstances with which these officers were presented, it does not arise to the level of deliberate disregard. In addition, there is considerable testimony, and I think the great way to the evidence is that this defendant never specifically asked to see a copy of the warrant, and that I think the fine deliberate disregard. Counsel, this is Judge Bybee. Did the district judge resolve that dispute? The defendants claimed that they requested repeatedly a copy of the warrant. The officers testified that they didn't ask that. Did the district court resolve that, or was it presented to the jury? It was not presented to the jury. The district court did not find or did not make a finding as to whether or not the defendant requested the warrant. The district court decided it would not be deliberate disregard even, or it just didn't speak to that. It found it was not deliberate disregard because of the circumstances presented by the search. The evidence is that there were four officers, thank you, Your Honor, who testified at the suppression hearing, all of whom testified that they were not asked for a copy of the warrant. And the district court did find, in regard to a different issue, against the defendant's testimony. As defense counsel noted, the defendant's position was he did not receive a warrant until September 24th. The court, in fact, found that the warrant was received on September 21st. So I think there is a question about whether it would be appropriate for this Court to make a finding of fact. And I do recognize that, Your Honor. This may be a case in which the evidence is so overwhelming, particularly since the district court found the defendant's testimony not credible on a different point that you could. I think my more significant point is that I think you would have to remand this case to the district court to specifically determine whether or not a request was made before you could find that there was deliberate disregard here, because I think you need a request under these circumstances for the warrant. I guess I would like to turn quickly to the other two issues while I still have time, if Your Honor should not have additional questions. As to the particularity of the warrant, I think I will rely principally on our brief here. I think the case law is quite strong that the description here was sufficient to provide the officers with – to allow the officers to find the place to be searched with relative ease and to make it probable that they would not be confused about the place to be searched. I do want to just mention or address one thing defense counsel said, which is that the government has argued that particularity here was established by the presence of the orange pickup truck. That is not our argument. In fact, I think in our footnote in our brief, we make the point that we're not relying on the presence of the truck at all, that there is sufficient particularity without the truck. Defense also notes that there was an error in the warrant. The warrant said this campsite was located down Cherry Creek Road at the lower Deer Creek. In fact, it was the upper Deer Creek. But the evidence in the record is quite clear that the only creek that Cherry Creek Road intersects within the geographic area defined is the upper Deer Creek. Defense counsel also said the lower Deer Creek is in the same geographic area. That is not, as far as I know, in the record. I can't say whether it's correct or not. I have no reason to doubt defense counsel, who is local and probably knows the area, but that's not within the record itself. Finally, as to the 924C issue, I should start by, I think, clarifying or correcting an issue that was raised. I believe, anyway, one of Your Honors asked where the key was located, and defense counsel indicated it was located on the key ring on the car. I don't believe that's actually what the record indicates. As I understand the record, Your Honor, it was not on the key ring. It was sitting on one of the canisters in one of the tents, in one of the, I believe it was the cook tent as opposed to the sleep tent. I'm not sure it was the which tent. There were two tents here, one which was sort of colloquially referred to as the cook tent, the other which was colloquially referred to as the sleep tent. It was in one of the tents on the rim of the canister. The key was in which one? Excuse me? The key was in which tent? That I'm not sure I know the answer to, Your Honor. Let me see whether I, in fact, have that. It was in the sleeping tent. It was on a propane tank that was in the sleeping tent. I don't think, however, that the fact that the key was not in the truck itself at the time is determinative in this case. I don't think that the government needs to prove its case at the split second at which the particular defendants were found. The testimony is they had taken this truck at the time towards the road. This is obviously a very rural area. And the road runs to the campsite and then about a mile to a mile and a half past it. The record indicates that the defendants, this is Tony Mann's testimony, had gone sort of towards that even more rural area. So they were just going off on a short rock hunt, as she put it. And they were just coming back from that excursion. There's no indication they were actively engaged in trafficking while they were gone or anything else. I think the key here is that the gun was found in proximity to the methamphetamine that had been produced in this manufacture, to tools of the trade, and to raw materials that were used in the manufacture of the methamphetamine in this case. Counsel, in Kraus we've got guns that are found in a motel room that are close to the paraphernalia and the tools of the trade, as you put it. But we really are quite close. Here we've got stuff in a truck that's in a locked safe where the keys are some distance away. There's no access to these guns. And after Kraus, it looks to me that we're looking at sort of a question as to whether the guns really have been used, whether there's some question here as to whether the guns really have been used to further this crime. I think the answer to that, Your Honor, is that there is sufficient evidence for a reasonable juror to conclude they were in this case. I think in addition to proximity, and I guess let me speak about that for a second before I go on to the in addition. They were, there's not a clear separation here between the truck and the tents, Your Honor. There was in the truck, as I put it, in the safe itself, scales. There was also pseudofedrin, which was, the testimony in the record was, was used as one of the base products for the manufacturer in this case. There was in the back of the truck some canisters, which could not be determined whether they were used but were of a type used in the manufacturer. I think the guns were there and I think very accessible to the tent in this rural area. This is not, you know, an urban area in which they necessarily had to get to it immediately. But I also think it is appropriate for Your Honors to take notice of the guns at issue here. There was a semiautomatic pistol of a type quite normally used in drug trafficking. In addition, there was a pen gun here. And as has been noted, that is not a weapon that's routinely used for things such as target shooting or other activities. It is, as other cases have cited in our brief, a weapon that's required to be registered because it has precious little law-abiding purpose. And I think this Court can take notice of that fact as well, and the jury reasonably could have taken notice of that fact. What was the period of the conspiracy as alleged in the indictment? The conspiracy as alleged was – I can check this in the record, Your Honor. I believe the way it was indicted was on September 21st and for periods before. I don't think it was very clearly indicted, but I would have to – the period was very clear in the indictment. I would have to look at it.  Yeah. It's taken – here are these people camped out in a remote area or fairly remote? They were both camped out and at least for one night were in Big Timber, and there's evidence of them purchasing precursor chemicals while they were there. And they're cooking the stuff at the campsite? Yes, Your Honor. And they have guns in their vehicle that are locked in a safe? Right. But the key is in the tent next to them when they're sleeping and easily accessible to them at the time they would be manufacturing and at times they would be at the site and would need to protect the manufacturer. And there was no evidence that there was any other reason to have this site other than the fact that they were cooking? Well, I don't – no, there was no evidence. I mean, there are obviously – there are obviously potential law-abiding purposes, too. This was a campsite. There was no reason they were – they were not prohibited from being there. Right. I mean, their defense was they were merely camping. That was their defense? I mean, that was part of it. I don't want to – I don't want to characterize and say that was their sole defense, but that was their explanation for why they were there. They were on a camping trip, or at least that was Defendant Mann's explanation for why she was there. If Your Honors have no further questions, we'll submit the case on the brief. Thank you. And Your Honors, again, for the people on the phone, this is Robin Hammond representing Mr. Pollender. I wanted to note a few things in the argument here. First of all, I wanted to cite the provision of the Krauss opinion that specifically holds that mere possession of a firearm at a drug-trafficking crime scene without proof that the weapon furthered an independent drug-trafficking offense is insufficient to support a conviction under 924C. That's quoted from page 967 of the opinion. The importance of that particular quote as it relates to this case is that, as this They were not immediately or easily accessible. Yeah, but they were. They were. What were they charged with? What was the period of the conspiracy? It was on or about September 20th. And then the indictment also – the indictment specifically says, on or about September 20th, 2002, and before including August of 2002, on public land administered by the United States Forest Service. That's the time period. And so it is vague. The only specific date that we see there is the September 20th date. What's particularly important here, too, is that – Isn't it overwhelmingly apparent from the evidence that they had the guns there in order to protect the site? I mean, they wouldn't leave them there. Well, they didn't leave the guns there. The guns were in a locked safe, which was a part of them. The guns with them. Right. They left the key there. Right. But is it true that the evidence showed that they were only – that they had been gone for – I believe they – I think the evidence was, and I could be wrong about this, this is just my memory from trial, is that they drove up the creek to go fishing for dinner, and then they came back down. To go what? To go fishing to catch their dinner. And so it's my understanding that, at any rate, wherever they went with this truck, the guns were locked in the truck. These were not guns that were immediately accessible to either of them as they were driving. At that moment. Right. But they clearly were during the course of the conspiracy as it was planned. Well, the other part of this, too, Your Honor, is that actually what came out at trial was not – I mean, they were obviously convicted, but there was – what the evidence at trial showed, the direct evidence, was boxes of items that could be used in the manufacture of methamphetamine. There was no used-up cook. There was no evidence of chemicals or methamphetamine mixtures spilt on the ground. This was something that was boxed up in one of the two tents. And this was also a vehicle that was traveling. It was seen in Big Timber the day before. It was seen in other areas in that campsite, that campsite location previous to this. So this box containing these chemicals that could be used in the manufacture of methamphetamine did not always accompany the firearms. In addition, Your Honor, there were no fingerprints found on these firearms. There was no – there was no indication that they were right there immediately present and immediately accessible to the two. Okay. Are you taking all the time for rebuttal with that? Unless Mr. Duke would like the remaining minute and a half. No. Thank you for offering that. You covered the points I was going to. Go ahead. Okay. Thank you, David. In addition, Your Honor, I just wanted to note that part of what happened here, the record is not crystal clear about when the search actually began. There's testimony at the suppression hearing that the search had started previously to the two defendants arriving. However, there's also evidence and testimony at the suppression hearing that the search didn't actually start until the arrival of this orange pickup truck, and I would refer the panel to page 42 of our excerpts of record. Specifically, Mike Rodriguez, who is one of the sheriff's deputies – Okay. In response to a question, question now while you and all the other officers were preparing to assess and secure the scene, you spotted an orange pickup truck, which you recognize as being Mr. Pollender's vehicle, correct, to which you responded correct. It indicates that the search actually hadn't begun. There were a number of law enforcement officers there taking direction from the I'm sorry. I see that my time has almost expired, unless there are additional questions. It just leads me to respond to the government's statement that this was not a federal search. This was a search conducted on federal land, conducted with and under the direction of Josh Adman, who was a Forest Service agent at the time. To suggest that this was a state search, especially in a rural area like Montana, is simply inappropriate. In Montana, it's extremely difficult at times to find a federal judge to sign off on a warrant. From the very beginning, there was no question that this case was going to be prosecuted by a United States attorney's office. Thank you, Your Honors. The case is disargued or submitted for decision. That concludes the Court's calendar for today. The Court stands adjourned. Thank you. All rise. This Court for this session stands adjourned. Okay, I'm going to disconnect the call, and Judge Biden, I will call you right back. Okay, thank you. Thank you.
judges: Schroeder, Tashima, Bybee